UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SILVESTRE DUENEZ, | CASE NO. C16-1238-JCC |
| Plaintiff, | ORDER |
| v. | |
| DAKOTA CREEK INDUSTRIES INCORPORATED, | |
| Defendant. | |

This matter comes before the Court on Plaintiff's motion for partial summary judgment (Dkt. No. 23) and motion to strike (Dkt. No. 28). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for summary judgment (Dkt. No. 25) and DENIES the motion to strike (Dkt. No. 28) for the reasons explained herein.

## I.     BACKGROUND

Plaintiff Silvestre Duenez ("Duenez") worked as a painter for Defendant Dakota Creek Industries ("Dakota") from May to September of 2013. (Dkt. Nos. 1 at 3, 24 at 140.) Dakota builds and repairs ships, and Duenez worked as part of a team that was supervised by a foreman and several "leads." (*Id*. at 32–33.) During his time at Dakota, Duenez worked under the direction of foreman Joe Robinson ("Robinson") and lead Brian Magana ("Magana"). (*Id*.)

Duenez, who was born in Mexico, believed that he was a frequent target of racially-charged jokes and comments, often coming from Magana and Robinson. (Dkt. No. 24 at 8–9, 11–13, 136.) In August 2013, Duenez spoke with Dakota's human resources manager, Aga Samsel ("Samsel"), about some of the harassment he felt he was experiencing. (*Id*. at 136.) Duenez told Samsel about a sexually-explicit bumper sticker that he thought Robinson had placed on his truck. (*Id*.) The sign read "I'm not gay but my ass is." (*Id*.) Duenez also told Samsel that other employees made jokes about his accent and treated him differently. (*Id*.)

In early September, Duenez provided Samsel with a written complaint describing additional allegations about Robinson's actions. (*Id*. at 146–47.) Duenez alleged that he caught Robinson using Duenez's cellphone to take a picture of Robinson's genitals. (*Id*. at 146.) Duenez additionally wrote that Robinson had asked him to give the sexually-explicit bumper sticker back to him, which made Duenez think Robinson had put the sticker on his truck. (*Id*.) Duenez also wrote that Robinson had condoned the jokes made about Duenez's accent. (*Id*. at 147.) Based on the complaint, Samsel conducted an investigation in which she spoke to Magana, Robinson, and others about Duenez's allegations. (*Id*. at 146–153.) Samsel concluded that the allegation about Robinson taking a picture of his genitals could not be corroborated. (*Id*. at 153.)

In addition to Duenez's complaints to Samsel, it is undisputed that Duenez had received write-ups for not following instructions, a safety violation, and failing to show-up for a scheduled shift. (Dkt. No. 26 at 9–18.) On September 27, 2013, Samsel informed Duenez he was being terminated by Dakota for not meeting expectations. (Dkt. No. 24 at 157.) Superintendent Rick Kirschman ("Kirschman") and Robinson were also involved in the decision to terminate Duenez. (Dkt. No. 24 at 117, 161.)

Duenez brings claims against Dakota for harassment based on his race and sex, hostile work environment, and retaliation under 42 U.S.C. § 1981, *et seq.* ("§ 1981"), Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"), and the Washington Law Against Discrimination, Revised Code of

Washington section 49.60, *et seq.* ("WLAD") (Dkt. No. 23 at 3.) Duenez asks the Court to grant partial summary judgment and rule that Dakota is liable for retaliation under state and federal law. (*Id*. at 4.) Duenez also asks the Court to dismiss two of Dakota's affirmative defenses (*Id.*) Dakota asks the Court to deny Duenez's motion in its entirety. (Dkt. No. 25 at 1.)

## II. DISCUSSION

### A. Duenez's Motion to Strike

Duenez asks the Court to strike Kirschman's declaration submitted with Dakota's response in opposition to summary judgment. (Dkt. No. 28 at 5). First, Duenez asserts that Kirschman had no personal knowledge of Samsel's investigation into his complaints, and therefore Kirschman's statements about the investigation are inadmissible hearsay. (*Id*. at 6.) Duenez next argues that many of Kirschman's statements contradict his deposition testimony and his declaration is thus a "sham" that cannot be used to create genuine disputes of fact. (*Id*. at 8.)

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed R. Civ. P. 56(c)(4). Kirschman can testify about Samsel's investigation even though he wasn't involved because Samsel "reported to [Kirschman] the results of her investigation." (Dkt. No. 27 at 3.) The Court additionally finds that Kirschman's statements about what Samsel told him could be admissible as non-hearsay because they demonstrate his state-of-mind, which is relevant to basis for Duenez's termination. *See Jones v. Los Angeles Cmty. Coll. Dist.*, 702 F.2d 203, 205 (9th Cir. 1983) (out-of-court statements about employee's performance and conduct were nonhearsay because they were offered to show non-discriminatory motive for termination).[1]

Under Ninth Circuit case law, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir.

---

[1] The Court expresses no opinion as to whether specific statements are admissible.

2012) (citation and internal quotation marks omitted). But this sham affidavit rule "should be applied with caution" because the Court must not make credibility determinations when resolving a summary judgment motion. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).

Duenez argues that Kirschman's declaration is a sham because parts of it contradict his deposition testimony. (Dkt. No. 28 at 8–9.) The Court cannot agree. Much of Kirschman's declaration either clarifies or elaborates on his deposition testimony. *See Van Asdale*, 577 F.3d at 999 ("[T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.") (internal quotation omitted). In his declaration, Kirschman points to sections of his deposition not cited in Duenez's motion that attempt to clarify his statements about how Duenez's complaints impacted the termination decision. (Dkt. No. 27 at 5.) Kirschman also elaborates on the reasons for Duenez's termination. (*Id*.) The Court does not find these statements contradictory, as Kirschman offered more than one reason in his deposition for Duenez's termination. (*See* Dkt. No. 24 at 110) ("I think it escalated. I think it went from he was being written up and disciplined for not wearing the harness and he just blew up, and then became, we're terminating you. I don't remember exactly. I just remember the outcome.").

To the extent that Kirschman's declaration testimony could be viewed as contradicting his deposition testimony, the Court believes such inconsistencies are better addressed at trial. Duenez's motion to strike (Dkt. No. 28) is DENIED.

**B.      Summary Judgment Standard**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the case's outcome. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there

is enough evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* at 49. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party, and all justifiable inferences must be drawn in the nonmovant's favor. *See Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255.

### C. Federal Retaliation Claims

Dakota asks the Court to apply the three-step burden shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green* to analyze the federal retaliation claims. 411 U.S. 792, 802 (1973). (Dkt. No. 25 at 7–8); *see, e.g.*, *Manatt v. Bank of Am.*, N.A., 339 F.3d 792, 800 (9th Cir. 2003) (applying the *McDonnell Douglas* framework to retaliation claims brought under Title VII and § 1981). Under the *McDonnell Douglas* analysis, if a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to provide a non-discriminatory reason for the adverse employment decision. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (citation omitted). If the defendant articulates such a reason, the plaintiff must demonstrate that the defendant's reason is merely a pretext for a discriminatory motive. *Manatt*, 339 F.3d at 800.

Since Duenez moves for summary judgment on his retaliation claims and would bear the ultimate burden of persuasion at trial, there is no need to apply the rigid *McDonnell Douglas* framework. *See Poland v. Chertoff*, 494 F.3d 1174, 1189 n. 2 (9th Cir. 2007) (discussing the differences between a plaintiff's burden in making a prima facie case of retaliation under *McDonnell Douglas* framework with a plaintiff's ultimate burden of persuasion at trial). Instead, the Court need only determine whether Duenez has shown that the undisputed material facts demonstrate that he is entitled to judgment on his retaliation claims such that no reasonable trier of fact could find for Dakota. *Anderson*, 477 U.S. at 251.

To prevail on his retaliation claims brought under Title VII and § 1981, Duenez must

prove by a preponderance of the evidence that: (1) he engaged in or was engaging in an activity protected under federal law; (2) Dakota subjected him to an adverse employment action; and (3) Duenez was subjected to the adverse employment action because of his participation in the protected activity. Model Civ. Jury Instr. 9th Cir. 10.8 (2017); *see also*, *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987) ("[f]acts sufficient to give rise to a Title VII claim are also sufficient for a § 1981 claim").

1. Protected Activity

Duenez asserts that he engaged in a protected activity when he made complaints to Samsel about race and gender harassment. (Dkt. No. 23 at 14–15.) Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. In order to be a protected activity, the plaintiff's opposition must have been directed toward a discriminatory act by an employer or an agent of an employer. *See Silver v. KCA, Inc.*, 586 F.2d 138, 140–42 (9th Cir. 1978). An employee engages in a protected opposition activity when his complaints are "based on a '*reasonable belief*' that the employer has engaged in an unlawful employment practice." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) (emphasis in original, citation omitted).

Duenez complained to Samsel twice before he was terminated. (Dkt. No. 24 at 136, 146.) On August 28, 2013, Duenez met with Samsel and told her that he had found the sign on his car that read "I'm not gay, but my ass is." (*Id.* at 136.) Duenez thought Robinson was involved in putting the sign on his car because Robinson had asked him to give it back several times. (*Id.*) Duenez also told Samsel that other employees made jokes about his accent. (*Id.*)

Less than a week later, Duenez gave Samsel a written complaint with similar allegations. (*Id.* at 146.) Duenez described the incident in which he walked into a company office to find Robinson using Duenez's cellphone to take a picture of his (Robinson's) genitals. (*Id.* at 23–25.) Duenez again describe the apparently homophobic sign on his car and wrote, "[Robinson] asked

me about 4 times about me giving the 'sticker' back to him. Then he told me let's take a ride and put it on someone else's car, which I did not agree to." (*Id.*) Duenez also wrote that Robinson was involved in other employees' jokes about Duenez, particularly "comments and discriminatory remarks about Duenez's speech and accent." (*Id.* at 147.)

In her deposition, Samsel stated that she believed Duenez had "claimed that he was discriminated because of his race." (*Id.* at 34.) When asked if she believed Duenez had complained about race discrimination Samsel stated "[p]ossibly, yes." Samsel also stated that she believed Duenez was making a sexual harassment complaint when he complained to her about the incident involving Robinson taking a picture with his cellphone. (*Id.* at 35.) Kirschman stated that he was aware of Duenez's complaints about Robinson. (*Id.* at 53–55, 137–138.)

The Court finds that Duenez reasonably believed he was engaging in a protected activity when he made his complaints to Samsel about Robinson. The reasonableness of Duenez's belief is supported by the nature of his complaints and the fact that both Samsel and Kirschman acknowledged the complaints alleged racial and sexual harassment. (*Id.* at 34–35, 118, 146–147.) Dakota counters that "considering that Plaintiff previously engaged in similar civil rights litigation, a jury could reasonably conclude Plaintiff knew he heard only isolated comments from others who were not in a position to terminate him, and that Plaintiff's goal was to secure an unwarranted promotion rather than in engage in protected activity." (Dkt. No. 25 at 11.) Dakota neither provides admissible evidence to support its argument, nor rebuts Duenez's evidence that he reasonably believed what he reported to Samsel amounted to discrimination.

For those reasons, the Court finds Duenez has met his burden on summary judgment to demonstrate that he engaged in a protected activity when he complained to Samsel.

### 2. Adverse Employment Action

Duenez asserts that he experienced an adverse employment action when he was terminated by Dakota. Adverse employment actions are actions by an employer that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a

charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006). The Ninth Circuit has observed that termination of an employee is commonly the adverse employment decision at issue in retaliation cases. *See, e.g.*, *Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir. 1986) It is undisputed that within a month of making his complaints to Samsel, Duenez was terminated by Dakota. (Dkt. No. 24 at 136, 157.) The Court concludes that Duenez suffered an adverse employment action when he was terminated.

        3. Causation

Duenez asserts that Dakota, through its speaking agent Kirschner, admitted that it terminated him because of the complaints he made to Samsel. (Dkt. No. 23 at 15.) A plaintiff is subjected to an adverse employment action because of his participation in protected activity if the adverse employment action would not have occurred *but for* that participation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (emphasis added).[2]

Duenez asserts that Kirschman admitted in his deposition that Duenez was fired because of the complaints he made to Samsel. (Dkt. No. 23 at 16.) Duenez supports this conclusion by pointing to the following testimony:

> Goldsworthy[3]: You said something about expending a lot of energy on an employee. Did Ms. Samsel feel that she was spending too much time investigating complaints that Mr. Duenez was making?
>
> Kirschman: No.
>
> Goldsworthy: What did you mean by expending too much energy on him?
>
> Kirschman: It seemed like we were spending more time with her in my office telling me the direction she was going and what she was dealing with now, which complaint now.

---

[2] Duenez correctly points out that *Nassar* deals with Title VII retaliation claims and it is unsettled whether that standard would apply to § 1981 claims. (Dkt. No. 23 at 16.) The Court thinks the reasoning in *Nassar* would apply to a § 1981 claim and uses that standard in this case.

[3] Duenez's counsel, Richard Goldsworthy.

> Goldsworthy: And so because of that you felt like it was the time to get rid of Mr. Duenez?
>
> Kirschman: At some point we would have come to that conclusion, that yeah, we're probably justified now in being able to terminate.
>
> Goldsworthy: At some point Dakota Creek did come to that conclusion; correct?
>
> Kirschman: Yes.

(Dkt. No. 24 at 109.) Kirschman further testified that Duenez should have been fired because he thought some of the information Duenez made in his complaints was untrue:

> Goldsworthy: Okay. The issues that you were talking about are issues surrounding his complaints to HR about supervisors and managers; is that correct?
>
> Kirschman: Correct.
>
> Goldsworthy: And those were the issues that led to his termination?
>
> Kirschman: Not the complaints themselves. The amount of time that they appeared to be mostly false accusations. My take is when somebody makes an accusation, depending on how bad it is, it needs to stick to the guy that you're talking about, or the guy that's making the complaint that's not found to be true.

(*Id*. at 132.) In a subsequent declaration, Kirschman specifically stated that he was bothered with Duenez's uncorroborated allegation that Robinson used Duenez's cellphone to take a picture of his genitals. Kirschman stated:

> During the course of Ms. Samsel's investigation, however, Mr. Duenez back-pedalled significantly from his charges. There were, in fact, no such photos on Mr. Duenez's telephone, and although Mr. Duenez identified several Dakota Creek employees who he said were witnesses to this supposed event, not a single one confirmed this allegation of misbehavior on the part of Mr. Robinson.

(Dkt. No. 27 at 3–4.) Although Samsel's investigation did not conclude that Duenez's allegations were false, she could not corroborate whether the situation with the pictures took place. (Dkt. No. 24 at 149–153) (no one other than Duenez said the incident occurred and no pictures were recovered.) A reasonable trier of fact could draw two inferences from the above testimony. First, it could find, as Duenez argues, that Kirschman's termination decision was based on Duenez's

complaints to Samsel regarding racial and sexual discrimination. (Dkt. No. 23 at 10.) Alternativley, a trier of fact could find that Kirschman's termination decision was influenced by Duenez complaints insofar as he thought the complaints lacked merit based on his understanding of Samsel's investigation.[4] Drawing all inferences in favor of Dakota, there is a dispute of material fact about how Duenez's complaints influenced Kirschman's decision to terminate him.

Duenez also treats Kirschman's testimony about his complaints as if he was the only person who made the termination decision. The evidence shows that Samsel, Robinson, and Kirschman were all involved with the decision to terminate Duenez. (*See* Dkt. Nos. 24 at 61, 29-1 at 6–7.) When Kirschman was asked who decided Duenez should be terminated he stated: "It was probably a joint conversation with Joe, myself, Aga, maybe not all in the same room, us having the same determination that it was time to go ahead and terminate." (Dkt. No. 29-1 at 8.) Samsel expressed to Duenez that he was fired for "not meeting expectations." (Dkt. No. 24 at 157.) When Robinson, who signed Duenez's termination paperwork, was asked why Duenez was terminated, he stated, "He only worked there five months and had a bunch of write-ups and wasn't a great employee, so. I'm assuming that's why." (*Id*. at 95, 117.)

Nor were Kirschman's statements regarding Duenez's complaints the only basis that Dakota offered to support Duenez's termination. (*See* Dkt. No. 24 at 161.) There is undisputed evidence that Duenez received a series of write-ups before and after he made his complaints to Samsel. (Dkt. No. 26 at 9–15.) Before making the complaints, Duenez was given two written warnings for not following instructions and for failing to wear a safety harness. (*Id.* at 9–15.) After his complaints, and within a few days of termination, Duenez was written up by Robinson for not showing up for a weekend shift. (*Id*. at 15.) Robinson also provided a written statement

---

[4] Duenez argues that Kirschman cannot testify about Samsel's investigation because he was not personally involved. (Dkt. No. 28 at 6.) The Court already addressed and rejected this argument in its discussion of Duenez's motion to strike. (*See supra* Part II.A.) To the extent there are contradictions between Kirschman and Samsel's deposition testimony regarding the investigation and the reasons for Duenez's termination, they must be considered and resolved by the trier of fact. *Anderson*, 477 U.S. at 255.

that described that on the day Duenez was terminated, he was late to a morning meeting and got into an argument with Robinson about his work assignment. (*Id*. at 17–18.)

The Court concludes there are disputes of material fact regarding the reasons for Duenez's termination. Viewing the evidence in the light most favorable to Dakota, the Court cannot conclude that Duenez's complaints of race and sex discrimination were the but-for cause of his termination such that a reasonable trier of fact could not find for Dakota. Duenez's motion for summary judgment on Dakota's liability pursuant to Title VII and Section 1981 is DENIED.

### D. State Retaliation Claim

Under WLAD, a plaintiff in a retaliation case must prove that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) the statutorily protected activity was a substantial factor in the employer's adverse employment decision. *Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1191 (Wash. Ct. App. 2000). Unlike federal retaliation claims, the plaintiff need not show that retaliation was the only or "but for" cause of the adverse employment action, but he or she must establish that it was at least a substantial factor. *Allison v. Housing Auth.*, 821 P.2d 34, 38 (Wash. 1991).

In line with its earlier analysis, the Court finds that Duenez engaged in a statutorily protected activity when he made complaints to Samsel and suffered an adverse employment action when he was terminated. *See supra* Part II.C.1–2. Similarly, the Court cannot conclude, as a matter of law, that Duenez's complaints about race and sex discrimination were a substantial factor in his termination. Although the substantial factor standard requires a lesser showing than "but-for" causation, there are genuine disputes of material fact regarding the reasons for Duenez's termination. *See supra* Part II.C.3. Therefore, Duenez's motion for summary judgment on his WLAD retaliation claim is DENIED.

### E. Dakota's Affirmative Defenses

Duenez moves for summary judgment on two of Dakota's affirmative defenses.[5] First,

---

[5] Dakota voluntarily dismissed its affirmative defense of waiver. (Dkt. No. 25 at 17.)

Duenez asserts that Dakota has not produced any evidence to support its defense that Duenez failed to mitigate his damages. (Dkt. No. 23 at 20.) Second, to avoid Duenez's hostile work environment claims, Duenez argues Dakota cannot assert the so-called *Faragher* defense. (*Id.* at 23–24.) This defense allows an employer to avoid being held vicariously liable for the harassment of its employees if defendant exercised reasonable care to prevent and correct harassing behavior. (*Id.* at 23–24.)

At trial, defendants have the burden of proof on their affirmative defenses. *Jones v. Taber*, 648 F.2d 1201, 1203 (9th Cir. 1981). Accordingly, when a plaintiff moves for summary judgment on an affirmative defense, it need only show that the nonmoving defendant does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23. The defendant must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

1. Mitigation Defense

For both federal and state employment discrimination claims, defendants bear the burden of proving a plaintiff failed to mitigate his damages. *See Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978); *Burnside v. Simpson Paper Co.*, 832 P.2d 537, 549 (Wash. Ct. App. 1992). To meet its burden, the defendant must show (1) that the damage suffered by the plaintiff could have been avoided, i.e. that there were suitable positions available with other employers that plaintiff could have discovered and for which he was qualified, and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position after his termination. S*ias*, 588 F.2d at 696.

Duenez asserts that Dakota has not put forward any evidence that demonstrates there were suitable positions available for Duenez, or that he failed to use reasonable care and diligence in seeking such positions. (Dkt. No. 23 at 21.) The Court agrees. Dakota does not

ORDER
C16-1238-JCC
PAGE - 12

1 include any facts that would allow a jury to conclude it has met its burden to prove Duenez failed to mitigate his damages by diligently seeking new employment. (Dkt. Nos. 9 at 5, 25 at 17.) Dakota merely states "Plaintiff cannot establish as a matter of law that he diligently sought employment for the entire time he seeks back pay and, thus, this defense remains appropriate." (Dkt. No. 25 at 17.)

It is not Duenez's burden to disprove Dakota's affirmative defense as a matter of law. Duenez met his burden of production by demonstrating Dakota had failed to provide evidence to prove the essential elements of its affirmative defense. *See Celotex Corp*, 477 U.S. at 322–23. Dakota's response is merely an attempt to shift its burden on summary judgment. Accordingly, the Court GRANTS Duenez's motion to strike Dakota's mitigation defense.

2. *Faragher* Defense

Under federal law, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). In *Faragher*, the Supreme Court created an affirmative defense that allows employers to avoid vicarious liability for the harassing conduct of its managers if: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id*. The defendant has the burden of proving both of these elements by a preponderance of the evidence.[6] *Id*.

Duenez argues that Dakota cannot satisfy its burden under *Faragher* because the

---

[6] Duenez asserts that Washington courts have not adopted the *Faragher* defense to hostile work environment claims brought under WLAD. (Dkt. No. 23 at 24.) In fact, Washington courts have split on this issue. *Compare Sangster v. Albertson's, Inc.*, 991 P.2d 674 (Wash. Ct. App. 2000) (recognizing *Faragher* defense), *with Henningsen v. Worldcom, Inc.*, 843, 9 P.3d 948, 957 (Wash. Ct. App. 2000) (declining to apply *Faragher* defense). Since the Court determines Dakota has not met its burden on summary judgment to present a *Faragher* defense for its federal claims, it need not decide here whether the defense applies to a WLAD claim.

undisputed evidence shows Duenez made multiple complaints to Samsel after being harassed. (Dkt. No. 28 at 13.) While Dakota provides evidence that Samsel conducted an investigation into Duenez's complaints, it provides no evidence that Duenez unreasonably failed to take advantage of any preventive or corrective opportunities provided by Dakota. (Dkt. No. 25 at 15.) Indeed, the undisputed evidence demonstrates that Duenez made multiple complaints to Samsel and cooperated during Samsel's investigation. (Dkt. No. 24 at 136, 146–47, 149–153.) Dakota has provided no evidence that it took action against any employees based on Duenez's complaints or provided him with any corrective or preventive opportunities. (*Id*. at 60–61.)

The Court thus GRANTS summary judgment and STRIKES Dakota's *Faragher* defense as to Duenez's federal and state hostile work environment claims.

## III. CONCLUSION

For the foregoing reasons, Plainitff's motion for summary judgment (Dkt. No. 25) is GRANTED in part and DENIED in part. Plaintiff's motion to strike (Dkt. No. 28) is DENIED. In accordance with its above ruling, the Court FINDS the following:

1. Plaintiff engaged in protected activity under Title VII, § 1981, and WLAD for the purpose of proving his retaliation claims.

2. Plaintiff suffered an adverse employment action under Title VII, § 1981, and WLAD for the purpose of proving his retaliation claims.

3. The Court STRIKES defenses numbered 2, 3, and 6 from Defendant's answer. Defendant is precluded from asserting these affirmative defenses at trial.

DATED this 19th day of January 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE